UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

PACER Cover Sheet
for Electronically Filed Documents

Any data shown here are current as of 06/10/06 . Any element of information on this form, except the received date, is subject to change as changes may be made to the Court's official docket.

| | |
|---|---|
| Case Title: | Directv, Inc. v. Danny Dunagan, et al. |
| Case Number: | 05-01028 |

## Document Information

| | |
|---|---|
| Description: | Memorandum Opinion re: [6-1] Motion For Summary Judgment by Danny Dunagan a Debra Dyan Dunagan. |
| Received on: | 2005-08-18 13:39:09.000 |
| Date Filed: | 2005-08-18 00:00:00.000 |
| Date Entered On Docket: | 2005-08-22 00:00:00.000 |

## Filer Information

| | |
|---|---|
| Submitted By: | Ellen Snyder |

**If this form is attached to the document identified above, it serves as an endorsed copy of the document as it existed on the above date. To confirm that nothing has changed since then, review the docket.**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:
     DANNY DUNAGAN,
     Debtor.                                              No. 7-04-17402 MR

DIRECTV, INC.,
     Plaintiff,

v.                                                        Adv. No. 05-1028 M

DANNY DUNAGAN and
DEDRA DYAN DUNAGAN,
     Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment as to All Counts (the "Motion") filed on April 18, 2005. Plaintiff, DIRECTV, Inc. ("Plaintiff") filed a response (the "Response") on May 9, 2005. Defendants filed a Reply Memorandum. The bankruptcy proceeding was filed on October 12, 2004. This dischargeability proceeding is based on causes of action for violations of federal statutory law and on a state common law cause of action for conversion. Plaintiffs assert that Danny Dunagan ("Defendant" or "Danny Dunagan") and his non-filing spouse, Dedra Dyan Dunagan ("Dedra Dunagan") are liable for damages for unauthorized interception of Plaintiff's satellite television programming. Specifically, Plaintiff seeks damages and injunctive relief for violations of the Cable Communications Policy Act (47 U.S.C. § 605) (CCPA), violations of the Electronic Communications Privacy Act (18 U.S.C. § 2511 et seq.) (the "Wiretap Act"), and civil conversion under state law. Plaintiff seeks to have any damage award declared non-dischargeable in

1

this bankruptcy or in a hypothetical bankruptcy filed by Dedra Dunagan.[1]

In the Motion, Defendants ask this Court to grant summary judgment on all counts of the Complaint. First, Dedra Dunagan argues that she could not have intercepted the satellite transmissions because she was not married to or living with Danny Dunagan when he purchased and allegedly used the devices. Moreover, Danny Dunagan stated in his affidavit that he disposed of the devices before he married Dedra Dunagan.[2] The Court finds that summary judgment in favor of Dedra Dunagan is appropriate on all counts because no evidence was presented to counter the affidavit statements that Danny Dunagan disposed of the devices before he married Dedra Dunagan and that Dedra Dunagan was not married to or living with Danny Dunagan when he allegedly used the devices to intercept satellite television. Because the Court will grant summary judgment dismissing the counts against Dedra Dunagan, the remainder of this opinion will focus on the claims against Danny Dunagan. The Court will refer to him as Defendant.

Defendant asserts that Plaintiff has failed to show that he actually intercepted Plaintiff's satellite transmissions, an essential element of liability under the federal statutory and state common law causes of actions. Defendant admits he purchased certain devices that can be used to intercept satellite television signals, but he argues that Plaintiff has failed to rebut his evidence that he used the devices for

---

[1] *See* 11 U.S.C. § 524(a)(3)(discharge of community debt precludes action against after-acquired community property unless debt is non-dischargeable as to non-filing spouse under § 523).

[2] Dedra and Danny Dunagan were married on May 19, 2004. Motion Ex. 2 Affidavit of Dedra Dyan Dunagan ("Dedra Dunagan Affidavit") at ¶ 2. Dedra Dunagan was not married to or living with Defendant during the period of May 1, 2001 and December 4, 2001, when the devices were purchased. Dedra Dunagan Affidavit at ¶ 3. Danny Dunagan discarded the devices in the summer of 2002, before he was married to Dedra Dunagan. Dunagan's Affidavit ¶¶ 5, 9, 11, and 12.

2

legitimate purposes in his computer business. The Court finds that genuine fact issues exist regarding whether Defendant used the devices to intercept satellite television signals in violation of the applicable federal statutes, and whether he converted Plaintiff's property.

In connection with this ruling, the Court finds the following:

## Undisputed Facts

1. Plaintiff is in the business of broadcasting satellite television programming. Plaintiff relays digital signals to satellites, and those signals are then broadcast to Plaintiff's customers.

2. Plaintiff provides access to television channels only by subscription agreement and on a pay-per-view basis. To receive the satellite programming, customers must set up an account with Plaintiff and must obtain an outdoor satellite dish and other system hardware. The satellite dish is connected to an indoor receiver, known as an integrated receiver/decoder ("IRD") (a unit approximately the size of a VCR), which is then connected to the customer's television monitor. *See* Response Exhibit B, Affidavit of James F. Whalen, Senior Director, DIRECTV Office of Signal Integrity ¶¶ 1, 5-7 ("Whalen Affidavit").

3. To prevent unauthorized reception and use of Plaintiff's transmissions, Plaintiff encrypts (digitally scrambles) its satellite transmission. Each customer is issued a removable access card, about the size of a credit card, containing a small microprocessor ("Access Card"), which when plugged into the customer's IRD, unscrambles the signal to provide access only the television programming purchased by the customer. The Access Card also captures and transmits the customer's pay-per-view information to Plaintiff for billing purposes via a telephone modem in the IRD. This is

accomplished through a "call back" in which Plaintiff contacts the modem each month and the modem reports any additional programming viewed by the customer. The customer is then billed for the additional programming. Whalen Affidavit ¶¶ 5-7.

4. Defendant purchased Plaintiff's satellite equipment on or about July 12, 1995 and opened an account with Plaintiff. Response Ex. C. Defendant subscribed to satellite television channels until June 21, 2003, when the Defendant's subscription was cancelled. Whalen Affidavit ¶ 33.

5. Certain devices can be used to reprogram the Access Card to illegally obtain additional programming, particularly pay-per-view programming, not included in the customer's subscription agreement.[3] Plaintiff circumvents the use of these illegally programmed Access Cards by replacement of older, compromised Access Cards with new, secure cards and by periodically transmitting electronic countermeasures ("ECMs"). ECMs are electronic signals sent through the data stream to disable reprogrammed Access Cards.[4]

6. On or about January 24, 2002, Plaintiff executed a Temporary Restraining Order on a company known as, EQ Stuff, Inc. Pursuant to the Order, Plaintiff obtained business records from EQ Stuff, which indicated that Defendant purchased the following devices on the following dates:

>   a) one EQ Zapulator and ten EQ Bootloaders on May 1, 2001;
>   b) three EQ Zapulators on May 21, 2001;
>   c) two EQ Bootloaders on June 4, 2001;
>   d) three EQ Zapulators and four EQ Bootloaders on June 20, 2001;
>   e) four EQ Bootloaders on September 14, 2001; and

---

[3] These devices may be purchased via the Internet, but some are available at retail stores such as Radio Shack.

[4] In January 2001, Plaintiff released an ECM that rendered certain unauthorized Access Cards inoperable. This ECM has become known as the "Black Sunday ECM."

f) six EQ Bootloaders on December 4, 2001.[5]

7. The EQ Zapulator is a device known as an "emulator." This device connects to a serial port of a personal computer and to the slot where an Access Card usually is located in an IRD. The personal computer is then able to run software that duplicates or "emulates" certain functions of an Access Card, which allows the user to access Plaintiff's programming services without payment. Emulators can also be used to bypass the effects of ECMs. Whalen Affidavit 27.

8. A "bootloader" is a device that can be inserted into the customer's IRD and connected to a disabled Access Card. Access Cards check the write-once memory during their boot cycle and are rendered inoperable if they detect new values from an ECM. Bootloaders provide a "glitch" that causes the Access Card to skip this check, thereby circumventing the effect of the ECM and reactivating disabled Access Cards. Whalen Affidavit ¶ 28.

9. On May 25, 2001, Plaintiff executed Writs of Seizure at the mail shipping facility used by Canadian Security and Technology ("Canadian"). Plaintiff obtained sales records, shipping records, e-mail communications, credit card receipts and other records, which indicated that on or about May 10, 2001, Defendant purchased two "MK1 Programmer/MK2 Unlooper-WTX Combos" from Canadian. Whalen Affidavit ¶ 26 and Response Ex. A DTV 02496. These devices can be used to clone Access Cards, enabling an inactivated Access Card to unscramble the same programming as a legitimate

---

[5] Documents seized at EQ Stuff offices showing these purchases were presented by Plaintiff in Response Exhibit A and numbered DTV 04440 through DTV 04445. Defendant argues in the Reply that these business documents from EQ Stuff should be stricken because they are unauthenticated, but in Defendant's recitation of the undisputed facts in his Motion, he admits purchasing 40 Access Devices from EQ Stuff. Therefore, the Court will deny the request to strike Exhibit A to the Response.

Access Card. These devices can also be used to program legitimate Access Cards to receive extra programming, including pay-per-view programs, without payment. Whalen Affidavit ¶ 30. The unlooper portion of the device can be used to restore illegally modified Access Cards that have been disabled by ECMs. The WTX Code is software that can be used to restore disabled Access Cards. Whalen Affidavit ¶ 31.

10. Plaintiff's business records show that Defendant possessed three Access Cards during his subscription period. None of the Access Cards reported additional programming on "call backs" during the time between the middle of 2000 and the date of cancellation in June 2003. This lack of call backs can indicate that a subscriber possesses an illegally modified Access Card and has unplugged his IRD from the phone line to avoid detection. Whalen Affidavit ¶ 34.

11. In March of 2001 just before he began purchasing the devices, Defendant changed his subscription agreement to a lower programming level. Account Records at DTV 03519.

12. Defendant is employed in Muleshoe, Texas as an internet technician, providing technical support for his employer's customers and working on his employer's computer systems. Defendant used to have a computer consulting business and computer sales business. Motion Ex. 1, Second Affidavit of Defendant Danny Dunagan ("Dunagan's Affidavit") ¶ 2-3.

13. Defendant was hired as a computer consultant by the Muleshoe Public Library to design access control cards for the library's public access terminals. Dunagan's Affidavit ¶ 4-5. Defendant states that he purchased an unlooper along with an ISO card programmer in connection with this project. Defendant states that the EQ Bootloaders and the other devices were purchased for use in his business. ISO card programmers and unloopers are used to program "smart cards" used by banks,

6

credit card companies, and by companies that use security access doors. Dunagan's Affidavit ¶¶ 5-13.

Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable fact finder could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* The court must consider the record in the light most favorable to the nonmoving party. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), cited in *DIRECTV v. Hosey,* 333 F.Supp.2d 1102, 1105-06 (D. Kan. 2004).

In Count 1 Plaintiff claims that Defendant violated the CCPA, which provides in relevant part as follows:

(a) Practices prohibited

> . . . No person not being authorized by the sender shall intercept any radio[6] communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). *See DIRECTV, Inc. v. Barnes*, 302 F.Supp.2d 774, 780 (W.D.Mich. 2004) (". . . to prevail on its claim under this section, DIRECTV must prove that [defendant] received, assisted in receiving, or intercepted DIRECTV satellite transmission.").

In Count 2, Plaintiff claims that Defendant violated the following provisions of the Wiretap Act, 18 U.S.C. §§ 2510, et. seq.:

> Interception and disclosure of wire, oral, or electronic communications prohibited
> (1) Except as otherwise specifically provided in this chapter any person who--
> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
> (b) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when–
> . . .
> (ii) such device transmits communications by radio, or interferes with the transmission of such communication;
> . . .
> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; [or]
>
> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in

---

[6]"Radio communication" includes television transmissions. *Allen B. DuMont Laboratories v. Carroll*, 184 F.2d 153 (3d Cir.1950), cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951).

8

subsection (5). 18 U.S.C. § 2511.

Section 2511 imposes criminal liability on one who intentionally intercepts, endeavors to intercept, or procures any other person to intercept any electronic communication; however, Section § 2520(a) creates a private cause of action for violations of § 2511. *Barnes*, 302 F.Supp.2d at 778. Actual damages or statutory damages are available in civil suits. 18 U.S.C. §§ 2511, 2520.

In Count 3 Plaintiff claims that Defendant violated another provision of the CCPA, which states as follows:

> (4) Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both. For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation.[7]

47 U.S.C. § 605(e)(4).

With respect to Counts 1 and 2, Plaintiff argues that the Court can infer that Defendant intercepted its satellite transmissions because he purchased devices which are primarily used to intercept Plaintiff's satellite transmissions and because his account history shows a lack of "call backs" from his Access Card and a change in his subscription level just before he began purchasing the devices. With respect to Count 3, Plaintiff asserts that the Court can also infer that Defendant used the devices to reprogram Access Cards and to design electronic systems for use in unauthorized

---

[7] Plaintiff requests an award of statutory damages, which are available for violations of the CCPA. 47 U.S.C. § 605(e)(C)(i)(II).

9

interception of Plaintiff's satellite signal. Plaintiff argues that by removing Access Cards and inserting altered Access Cards into IRD's, Defendant engaged in the unlawful assembly and/or modification of devices primarily used in unauthorized decryption of satellite programming in violation of 47 U.S.C. § 605(e)(4). Moreover, Plaintiff alleges that the number of devices purchased by Defendant indicates that he was distributing to others devices to aid in the interception of satellite transmissions, which is also prohibited by § 605(e)(4).

In Count 4 Plaintiff claims that Defendant converted Plaintiff's property for his own use or benefit. Under New Mexico law, conversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made. *Nosker v. Trinity Land. Co.,* 107 N.M. 333, 337-38, 757 P.2d 803, 807-08 (N.M.App. 1988). Using devices for unauthorized interception of satellite programming can constitute a conversion of property. *See DIRECTV, INC. v. Karpinsky*, 274 F.Supp.2d 918, 921 (E.D.Mich. 2003)(denying summary judgment to defendant on conversion claim where evidence showed purchase of interception devices).

Counts 5-7 allege that any damage award is non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).

Regarding Counts 1 and 3 alleging violations of the CCPA, Defendant argues that only an aggrieved person can pursue a civil claim under the CCPA, and Plaintiff is not an "aggrieved person" as

10

defined by 47 U.S.C. § 605(d)(6).[8] According to § 605(d)(6), the term

> "any person aggrieved" shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming, and, in the case of a violation of paragraph (4) of subsection (e) of this section, shall also include any person engaged in the lawful manufacture, distribution, or sale of equipment necessary to authorize or receive satellite cable programming."

Plaintiff is a retail distributor of satellite programming and satellite receiving equipment; therefore, Plaintiff is a person aggrieved for purposes of the CCPA. *See also, DIRECTV v. Boonstra*, 302 F.Supp.2d 822, 829 (W.D.Mich. 2004)(finding that DIRECTV had standing as person aggrieved under § 605).

With respect to Counts 1-3, Plaintiff claims that a fact issue exists regarding whether Defendant used the devices to intercept its satellite transmissions and that Defendant's explanation of how he used the devices calls for a credibility determination. Defendant does not dispute that he purchased the devices listed above. However, Defendant asserts that he only used the devices for legitimate purposes in his computer sales and consulting business. Defendant asserts that some of the devices are available at retail stores, including Radio Shack, and that these devices have legitimate uses. Dunagan's Affidavit ¶ 12. Defendant described one project in which he was hired by a public library to design access cards for the library's access terminals. Dunagan's Affidavit ¶ 4. Defendant asserts that one of the devices, the MK1 Programmer/MK2 Unlooper-WTX Combo, allowed him to program the library access cards and then make changes to the programming when errors were made. Dunagan's Affidavit ¶ 5. Defendant states that the same devices are used to program "smart cards" that are used by banks and

---

[8] Pursuant to the CCPA any person aggrieved by any violation of § 605(a) may bring a civil action in a U.S. District Court or any other court of competent jurisdiction. 47 U.S.C. § 605(e)(3)(A).

11

financial services companies. Dunagan's Affidavit ¶ 5.  Defendant denies using any of the devices to intercept satellite television programming.  Dunagan's Affidavit ¶¶ 5, 11-12.  Defendant also claims he discarded all of the devices in 2002 when they became obsolete.  Defendant's Affidavit ¶¶ 9-12.[9]  Additionally, Defendant argues that Plaintiff lacks direct evidence that Defendant used the devices to intercept Plaintiff's satellite signal.  Defendant argues that a crucial element of Plaintiff's case, unauthorized interception of satellite signal, is not supported by any evidence.[10]

Plaintiff argues that the Court should deny summary judgment because it has presented circumstantial evidence to raise a genuine factual dispute regarding whether Defendant intercepted its satellite signal without authorization.  First, Defendant was a DIRECTV subscriber with the appropriate

---

[9] Defendant asserts that this evidence also supports summary judgment on the claim for injunctive relief.

[10] In his Reply to the Response, Defendant argues that Whalen's Affidavit does not properly state the basis upon which he is familiar with the devices at issue.  Defendant argues that familiarity with such devices requires specialized knowledge of an expert, and Whalen's Affidavit does not indicate how he qualifies as an expert on these devices.  According to Defendant, Whalen may not render an opinion on an ultimate fact issue, i.e. whether Defendant intercepted satellite transmissions.  *See* Rules 702 and 704(a), Fed. R. Evid.

Whalen states that he is the Senior Director in DIRECTV's Office of Signal Integrity, principally responsible for investigating piracy of DIRECTV's satellite transmissions.  Whalen further states that he has overseen several hundred investigations of individuals and businesses engaged in the design, manufacture, distribution and sale of pirate Access Cards and other pirating devices.  Whalen's affidavit otherwise meets the standards of Rule 7056(e), Fed. R. Bankr. P.

Although Whalen does not claim to be an expert, the Court finds that he is qualified to give an opinion on the devices at issue because of his experience in similar investigations.  Therefore, the Court will consider the evidence in Whalen's affidavit concerning the use of these devices.

Plaintiff also argues that many of Whalen's statements are inadmissible hearsay.  The Court has not considered any hearsay statements in this decision.  See *Casas Office Machines, Inc. v. Mita Copystar,* 42 F.3d 668, 682 (1st Cir. 1994), citing 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (3d ed. 1998)(". . . [A] court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it.").

12

satellite receiving equipment and is familiar with computer and technical equipment. Second, the devices purchased by Defendant can be used to intercept satellite television signals. According to Whalen, the sole purpose for some of the devices is interception of satellite signals. In addition, Whalen testified that there is no reason to purchase a bootloader device unless a purchaser is in possession of a DIRECTV Access Card that has been disabled by an ECM. Whalen Affidavit ¶¶ 28-29. Moreover, ECM's only disable unauthorized or altered Access Cards, supporting the inference that Defendant possessed an unauthorized Access Card. Whalen Affidavit ¶ 11. According to Whalen, the MK1 Programmer is designed and marketed to permit illegal programming of valid Access Cards. This device can be used to clone a disabled Access Card enabling it to receive the same programming as an authorized Access Card or it may be used to program a valid Access Card to receive more DIRECTV programming than the Access Card is authorized to receive. Whalen Affidavit ¶ 30. The MK1 Programmer was purchased with an MK2 Unlooper. Whalen states that there is no legitimate purpose for MK2 Unlooper device. This device was shipped with WTX Code, which Whalen states is a type of software designed to restore disabled DIRECTV Access Cards. Whalen Affidavit ¶ 31. Third, Defendant's account history supports an inference that he was intercepting satellite programming. According to Whalen, lack of call backs from Defendant's IRD for three years during his subscription period, can indicate that Defendant used an altered Access Card. Whalen Affidavit ¶ 34. Also, Defendant changed his subscription to a lower level two months before his first purchase of devices from EQ Stuff. Response Ex. 1, DTV 03514.

  This type of circumstantial evidence has been found sufficient to deny summary judgment on similar claims. *See e.g. DIRECTV, Inc. v. Hosey,* 333 F.Supp.2d 1102, 1107 (D. Kan.

2004)(denying summary judgment with evidence that defendant was subscriber who abruptly stopped purchasing pay-per-view movies prior to receipt of unlooper and unplugged DIRECTV equipment from phone line); *Barnes*, 302 F.Supp.2d at 784 (finding material fact issues on evidence that defendant was subscriber who purchased an unlooper, whose account history supported use of device and who admitted he purchased an unlooper to obtain free DIRECTV but was unable to get device to work); *Karpinsky*, 274 F.Supp2d 918, (E.D. Mich. 2003)(denying summary judgment on reconsideration when presented with evidence that showed that the defendant was DIRECTV subscriber and purchased pirate access devices from a retail store); and *Community Television Systems, Inc. v. Caruso*, 134 F.Supp.2d 455, 461 (D.Conn. 2000), *aff'd* 284 F.3d 340 (2nd Cir. 2002)(holding that circumstantial evidence of defendants' purchase of descrambler devices and defendants' assertion of 5th amendment privilege against self incrimination was sufficient to show violation of CCPA). Therefore, the Court finds that the circumstantial evidence presented here is sufficient to raise genuine fact issues as to whether Defendant intercepted satellite signals and/or assisted others in intercepting satellite signals precluding summary judgment in favor of Defendant on Counts 1, 2 and 3.

Conversion under New Mexico Law

Defendant argues that he could not be liable for conversion of Plaintiff's satellite signal because he did not deprive Plaintiff of its signal, a required element of a conversion claim. Defendant cites *DIRECTV v. Lockwood*, 311 F.Supp.2d 1147, 1150 (D.Kan. 2004), in which the court rejected Plaintiff's claims for conversion of its signal because the defendant was not in exclusive possession of Plaintiff's property as required by Kansas conversion law. *See id.* at 1149 (stating that conversion

14

under Kansas law is the "unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.")(citations omitted). Under New Mexico law, however, a conversion can be the exercise of control over personal property belonging to another in exclusion or defiance of the owner's rights, or the unauthorized and injurious use of another's property. *Nosker,* 107 N.M. at 337-38, 757 P.2d at 807-08. Courts in other states have allowed claims for conversion of satellite signals, and based on the New Mexico definition of conversion, the Court finds that Defendant can be liable for conversion of Plaintiff's signal under New Mexico law. *See e.g.*, *DIRECTV, Inc. v. McCool*, 339 F.Supp.2d 1025 (M.D.Tenn. 2004)(allowing claim under Tennessee conversion law); *DIRECTV v. Alter*, 2004 W.L. 1427108 at * 3 (N.D.Ill. 2004)(noting difference in opinion within Northern District of Illinois and concluding that a satellite signal can be converted); *DIRECTV, Inc. v. DiSalvatore*, 2003 WL 24051575 at * 6 (N.D.Ohio 2003)(allowing claim under Ohio conversion law); *Don King Productions/Kingvision v. Lovato*, 911 F.Supp. 419, 423 (N.D.Cal.1995) (allowing claim for conversion of television signal under California law). The Court finds that interception of a satellite signal can constitute conversion under New Mexico law; and therefore, summary judgment on the conversion claim is inappropriate.

Conclusion

The evidence that Defendant was a DIRECTV subscriber with equipment necessary to receive DIRECTV's satellite transmission, that he purchased devices that can be used for unauthorized interception of satellite television signals and evidence of Defendant's account activity, which was changed just before he purchased the devices, is sufficient to create genuine issues of fact precluding summary judgment on Plaintiff's claims under the CCPA, the Wiretap Act and for conversion.

15

For the foregoing reasons, the Court will grant the Motion as to Dedra Dunagan, and will deny the Motion as to Defendant, Danny Dunagan. An appropriate order will be entered.

*signature*

MARK B. McFEELEY
UNITED STATES BANKRUPTCY JUDGE

I certify that on the date shown on the attached document verification, a true and correct copy of the foregoing was either electronically transmitted, faxed, delivered or mailed to the listed counsel and/or parties.

Douglas R. Vadnais
Attorney for Plaintiff
P.O. Box 2168
Albuquerque, NM 87103-2168

Eric D. Dixon
Attorney for Defendants
309 South Avenue A
Portales, NM 88130

*signature*

Ellen C. Snyder
Law Clerk

16